Johnson v. Schrader.

---

No. 24,547.

ANNA JOHNSON, *Appellee*, v. HENRY G. SCHRADER et al., Executors, etc., et al., *Appellants*.

SYLLABUS BY THE COURT.

ACTION TO SET ASIDE WILL AND DEED—*Incapacity—Undue Influence.* The evidence is held to support a judgment setting aside a will for incapacity and a deed for incapacity and undue influence.

Appeal from Saline district court; DALLAS GROVER, judge. Opinion filed October 6, 1923. Affirmed.

*T. M. Lillard,* of Topeka, *C. W. Burch, B. I. Litowich,* and *La Rue Royce,* all of Salina, for the appellants.

*Z. C. Millikin,* and *David Ritchie,* both of Salina, for the appellee.

The opinion of the court was delivered by

MASON, J.: George Schrader died December 6, 1919, survived by his widow, Caroline, two sons, Henry and George H., and a daughter, Anna, the wife of Albert Johnson. February 25, 1919, he had executed a will leaving to his wife all his property (which appears to have been worth some $148,000) and appointing his sons execu-

tors with power to manage it and to sell any of it and invest the proceeds as they should see fit. May 7, 1919, he and his wife had executed a deed to his sons for all his real property, reserving a life estate to the grantors. This action was brought by Anna Johnson against the widow and sons to set aside the will and deed on account of want of capacity and undue influence. Judgment was rendered in her favor and the defendants appeal.

The trial court found that Schrader had not sufficient mental capacity to make either the will or the deed, and that the execution of the deed by him was the result of undue influence exercised by Henry Schrader and his mother. A reversal is asked upon the ground that there was no substantial evidence of want of capacity or undue influence. There was testimony showing or tending to show these facts bearing upon his mental condition:

Schrader was confined to his room and for most of the time to his bed after September, 1918, suffering greatly from rheumatism. In the fall of that year he told his wife to get an ax and strike him in the head with it, as he did not want to live any longer. In November he told the plaintiff's mother-in-law, who was calling on him, that he had had a fight with the devil, but had the best of him and threw him out of the window. He was asked in a joking way what the devil looked like, and answered that he was a long bony skeleton. His part of the conversation was in earnest. The caller did not undertake to see him again because she was told by others that they never let anybody in. February 18, 1919, he drank a quantity of gasoline—stated by him to be about half a gallon. Henry called a doctor by telephone. The doctor asked what was the matter and the question was not answered. The doctor found Schrader in a semiconscious condition. He gave him an emetic and he threw up quite a little of the gasoline. He was asked why he drank it and answered that he was thirsty. The doctor was well acquainted with Schrader—had known him a long time—and was of the opinion he was then of unsound mind, although there were times afterwards when he was apparently all right, and other times when he was doubtful about it. When the doctor left, Henry Schrader followed him out to his car and asked him not to say anything about his father having taken the gasoline. The next month, while the doctor was still in attendance on account of the illness following the drinking of the gasoline, Schrader told the plaintiff's husband, between spells of crying, that the medicine given him was too strong, that it

burnt him up inside and his teeth were all loose. In November, 1917, Schrader had asked this doctor to see that they did not send him to an asylum or lock him in a room. May 22, 1919, another doctor was called to see Schrader and had some conversation with him and concluded that he was insane. Schrader said he had syphilis, but the doctor found no indications of it.

Early in 1919 or in the fall of 1918 Caroline Schrader told the plaintiff that Schrader needed watching, that she took all the medicine and guns and knives away from him and was afraid of him; that he wanted all the windows boarded up, and that this was done; that he wasn't acting like he used to. When the plaintiff, learning that a doctor had been sent for on the day of the gasoline episode, asked her mother and brother Henry what was the matter with her father, they put her off with a statement that there was not much the matter with him, and did not tell her about his drinking the gasoline. The plaintiff about this time having noticed that telephone calls (on a party line) for the Schrader home remained unanswered asked Henry Schrader the reason, it being said in the conversation that the calls were from persons wishing to inquire about Schrader's condition. He replied that if anyone would call up and ask him how the old man was he would tell them it was none of their business. The plaintiff's husband was denied access to Schrader by Mrs. Schrader on the ground that while he was feeling well the visit would make him excited and nervous. Henry Schrader told the plaintiff that the reason her husband was excluded while another caller was admitted was because they could trust the caller—he would keep still. The plaintiff and her husband did not know of the serious character of her father's last illness until about half an hour before his death, when a neighbor told them of it. The day the will was executed the plaintiff's mother told her that Henry had said he was going to tell the witnesses to the will not to talk to Schrader so much, it would make him nervous and excited—he was too weak. Mrs. Schrader, about the first of February, 1919, told the plaintiff's husband that Schrader didn't want to see anybody and that he should not come there. An old acquaintance undertook to call on him and was told by his wife he had given orders that he didn't care to see any company. Sometime in 1919 Henry told a neighbor—an old friend who had previously made a call—that his father was funny and didn't care to see anybody.

The plaintiff saw Schrader in July, 1919. Henry told her not to

bother him so much as he was very weak and nervous. She came into the room where her father was and said, "Hello, Pa." He held up his hands and said, "Oh, oh, oh." He did not shake hands with her. He mumbled—went from one room to another mumbling.

Schrader's wife told a friend that Henry had the deed made out himself because her husband was not. able to do so. She testified that her husband's mind was just the same when he signed the will and deed as the day he told the doctor he had syphilis—that his mind was right all the time.

The will was signed in the presence of the defendants and the two subscribing witnesses, who were neighbors called for the purpose by Henry Schrader, who produced it. The witnesses talked but little with the testator, merely "bidding him the time" and speaking about his sickness. He asked if it was necessary to read the will. Some one said it was and Henry Schrader read it. His wife asked him if he was satisfied and he said something to the effect that "a fellow has got to do his best in a satisfactory manner." One of the witnesses said he (the witness) "didn't seem to see anything different from usual" in his mental condition. The other said he was all right so far as he knew. Neither had seen him for more than six months before and neither ever saw him again.

In 1915 Schrader told the plaintiff that if she and her husband would occupy 238 acres of land he had lately bought, improve it and make it their home she should have it. The proposition was accepted and acted upon, $2,500 being spent in improvements, and thereafter Schrader and his wife said he had given the plaintiff the place and spoke of it as hers. This land was included in the deed the validity of which is attacked. An issue was presented in this case and is still pending as to the plaintiff's title under this arrangement.

Oral testimony was introduced by the defendants tending to show that Schrader was competent at all times, and especially when the will and deed were signed, but its credibility and weight were necessarily for the determination of the trial court and it is not available here to overthrow the judgment if a *prima facie* case was made out in favor of the insanity theory.

We think there was substantial evidence to justify the finding that Schrader was mentally incompetent to execute the will or the deed. Of course a single instance of delusion would not be sufficient for that purpose, and the vital question is as to his mental condition

at the time the instruments were executed. But the various specific acts tending to show unsoundness of mind, coupled with the opinions of the two physicians, warrant a finding that his unsoundness of mind was not merely occasional but a continuous condition which once established may be presumed to have remained unchanged in the absence of controlling evidence to the contrary. (*The State v. McMurry,* 61 Kan. 87, 58 Pac. 961; 28 R. C. L. 99.) While one of the doctors thought Schrader's condition varied, the defendants' view is that he was at all times entirely competent, rather than that he was at one time insane and at another lucid. An inference of lack of frankness on their part may be drawn from the evidence suggesting a purpose to conceal his condition. The persons called in to attest the will did not have such opportunity to observe the conduct of the testator as to entitle their opinion to the weight at times given to the testimony of subscribing witnesses, assuming their credibility to be beyond question—a matter of course for the determination of the trial court.

There was evidence that in May, 1918, a banker at Schrader's request prepared a will for him, which was never executed, leaving all his property to his wife and naming the bank as executor. Granting that this shows he planned such a disposition while mentally competent, it does not necessarily establish his competency when he later executed the will in question.

The defendants suggest that the finding of the court enumerating certain specific incidents tending to show insanity should be regarded as eliminating any grounds of the finding of incompetency not mentioned. The finding, however, excluded that theory by saying that "the evidence disclosed other things strongly tending to show that said Schrader's mind was failing fast."

There was evidence of these facts bearing upon undue influence affecting the execution of the deed: The plaintiff's parents had objected to her marriage (in 1911) and some ill-feeling resulted, which, however, was afterwards allayed, and the relations between Schrader and his wife on the one hand and the plaintiff and her husband on the other became entirely friendly. Schrader and his wife made various gifts to the plaintiff and her husband, and Mrs. Schrader cautioned them not to let the boys—Henry and George H.—know about it because they would make trouble. About the middle of March, 1919, the plaintiff and her husband went to see Schrader. He was in bed and was crying. They started to leave and he called

them back and told them to shut the door. This was done and just then Mrs. Schrader came in. He told her he wanted to talk to the others alone, but she stayed in and he told nothing.

Schrader had a daughter, Lena, who died suddenly May 2, 1919. She had been out of her mind for a few days several years before, and had another attack of the same sort in the spring of 1919, remaining out of her mind until she died. Rumors were circulated to the effect that Henry Schrader was responsible for her death. The sheriff and county attorney conducted an investigation in which he was subjected to a severe and searching examination. He told his father of this, charging the plaintiff's husband with trying to have him arrested and with having been the cause of the suspicion against him. His own testimony concerning his talk with his father on the subject was interpretable as showing a want of candor. In the course of his cross-examination the following colloquy followed his statement that his father had said the Johnsons were "trying to run [so the transcript reads, although the word may have been ruin] the Schraders:"

"Q. And do you know where he got that information? A. I guess I do.

"Q. You gave it to him yourself didn't you? A. I suppose I did.

"Q. That is right. I say you gave it to him, you understand that, I say you gave him that information yourself, didn't you? A. Yes, sir.

"Q. When? A. After sister Lena died.

"Q. And about what day, she died on the second, didn't she? A. Yes, sir.

.    .    .    .    .    .    .    .    .    .    .

"Q. What did you tell your father on that subject at that time? A. I didn't say much.

"Q. What did you tell him? A. I didn't say much.

"Q. Well, you said something, what was it? A. I didn't say nothing.

"Q. What is it? A. I didn't say anything.

"Q. Well you said awhile ago you did? A. Said what?

"Q. About Johnson? A. Well I testified to that.

"Q. Well, what did you tell your father then about Johnson? A. I didn't say anything about that.

"Q. Didn't you say a moment ago that you gave your father the information that Johnson was trying to run Schrader?

"The court: Ruin.

"Q. Or ruin Schrader? A. No, sir.

"Q. Do you deny that? A. He told my mother that.

"Q. Then I asked you where your father got that information and didn't you say that you told him? A. Well, I told him, of course.

"Q. What did you tell him? A. Well, just what happened.

.    .    .    .    .    .    .    .    .    .    .

"Q. Will you tell the jury what it was? A. Yes, sir.

Johnson v. Schrader.

"Q. All right, go ahead. A. I told him that Mr. Crowther and Winterbotham [the county attorney and coroner] came down and investigated the body of my sister.

"Q. Yes, what else? A. And as soon as they got there they separated me, my wife and my brother and kept me in a sweat box about three hours, between two and three hours.

"Q. Did you tell him who did that? A. Yes, sir.

"Q. Who? A. Crowthers and Mr. Winterbotham.

"Q. Yes, then what? A. Well, that is about all what I said about it.

"Q. Was that all you told him? A. Well, oh—I says, too, that they was the ones that got the coroner to come out there.

"Q. Told your father that? A. Yes, sir.

"Q. What Johnson do you refer to? A. I think I referred to both of them.

"Q. What Johnsons? A. C. P. [Albert's father] and Albert.

"Q. Did you tell him anything further? A. Told him just the way they tried to turn the sentiment of the community against me."

Albert Johnson, the plaintiff's husband, was cross-examined at length regarding his connection with the investigation of Lena's death. He denied that he told the story that there had been foul play and that Henry was responsible for it. He testified that he and his father went to a doctor (the same one whom Schrader had told he had syphilis), who told them to go to the coroner and he would join them a little later. They went to the coroner's office. Asked if he had said that it looked like there had been foul play and that the coroner ought to investigate the matter, he answered that he said nothing about foul play. He denied asking the officials to make an investigation, or going to them for that purpose, but said he told the coroner he thought there ought to be something done, or rather said that while the coroner was present. He denied also telling the doctor that it looked suspicious and that something ought to be done—said that he did not tell him anything about that, and did not come to him to have Lena's death investigated—that that was not the intention. He denied saying in substance that it looked like foul play, or anything of that kind. He said that he and his father were there to meet the officers the day they went out to investigate. He denied telling the county attorney that Lena had been locked up in a boarded room, that Henry had beaten her or that the officers were not doing their duty.

The county attorney testified that Albert Johnson had told him that Lena had been locked up in a boarded room; that Henry had beaten her with a club or stick; that she died suddenly and that they didn't have a doctor; and that everything indicated foul play

and there ought to be an investigation. He also testified that later Johnson said the officers had not performed their duty because no arrests had been made.

A jury called in an advisory capacity made a number of findings in answer to specific questions. The court adopted most of these but not all. One of those not adopted was the answer "Misrepresentations" to a question calling for a specific statement of the nature of the undue influence exerted upon Schrader. The defendants regard the rejection of this answer as equivalent to a finding by the court that all the representations made to Schrader by which he was influenced to sign the deed were true. We do not interpret it as going to that extent. While it may indicate a belief that the statements by which the making of the deed was induced were not wholly false, it does not necessarily mean that they were wholly true. The situation lent itself readily to an exaggeration of the facts, and we cannot say the evidence did not justify a belief that the defendants availed themselves of the opportunity to make unfair use of the episode.

On the day the deed was executed a separate written contract was entered into between Schrader and his wife on the one hand and their sons on the other by which the latter agreed that in case the plaintiff should be left without the support of her husband, by death, divorce, or separation, they would pay her $1,000 a year for her life, and give her the use of the old home of the parents, including about an acre of land. There is no room for doubt, and it is not disputed, that the deed was executed because of what Schrader was told of the conduct of the plaintiff's husband in connection with the investigation of the death of Lena. We think there was substantial evidence to support the trial court's finding that the statements made to him on the subject were of such character that obtaining his signature by means of them amounted to undue influence.

The defendants requested several specific findings, and complain of the refusal of the court to make them. The requests were not to determine one way or the other particular issues, but to find in favor of the defendants' contentions in respect thereto. All but one related to matters already passed upon and are disposed of by the conclusion that there was substantial evidence in support of the findings of incapacity and undue influence. In the remaining instance the contention is made that the indisputable evidence com-

pelled the finding asked. If that is true the evidence itself would serve the same purpose as a finding and no substantial prejudice could have resulted from its not having been embodied in that form. The defendants also challenge the accuracy of the findings as to some details that have not been mentioned, and raise other points that have not been discussed, but the considerations stated are regarded as requiring an affirmance.

The judgment is affirmed.

