No. 27,134.

VANIE M. POST et al., *Appellees*, v. NORMAN W. HODGES et al.,
*Appellants*.

SYLLABUS BY THE COURT.

1. DEEDS—*Undue Influence—Evidence.* The evidence is held sufficient to sustain a finding that the execution of several deeds by a father to his sons was procured by undue influence on their part.

2. SAME—*Special Findings.* The refusal to make several requested findings is held not to have been erroneous.

3. SAME—*Undue Influence—Evidence.* The refusal to admit the introduction in evidence of the journal entry of earlier proceedings in the case on trial, in which a jury served in an advisory capacity only, was not erroneous, the court taking judicial notice thereof.

Appeal from Pottawatomie district court; MARTIN A. BENDER, judge. Opinion filed February 12, 1927. Affirmed.

*George D. Rathbun,* of Manhattan, *A. E. Crane, B. F. Messick* and *A. H. Crane,* all of Topeka, for the appellants.

*C. E. Carroll* and *A. E. Carroll,* both of Alma, for the appellees.

The opinion of the court was delivered by

MASON, J.: Ernest M. Hodges, a widower, 84 years of age, died intestate March 6, 1925. His heirs were four daughters, Vanie M. Post, Ethel D. Dalton, Aimee M. Pratt and Belle T. French, and three sons, Norman W., Lemburn and Elmer E. On February 26, 1924, he executed a deed to each of the three sons. This action was brought against them by the four daughters asking the setting aside of these deeds on the grounds of undue influence and want of capacity. A trial resulted in findings of undue influence by an advisory jury, which were adopted by the judge, with numerous detailed findings of his own, and a judgment in favor of the plaintiffs, from which the defendants appeal.

On February 19, 1925, the father executed a deed to each of his daughters. Their petition also asked that these be set aside on the same grounds. At a first trial of the case the court held that these deeds were valid and were made while the grantor was of sound and disposing mind, but that the deeds to the sons were procured by

---

Cancellation of Instruments, 9 C. J. pp. 1254 n. 2, 1256 n. 14, 1257 n. 45, 1258 n. 62. Deeds, 18 C. J. p. 445 n. 34; 8 R. C. L. 1034. Evidence, 23 C. J. p. 110 n. 15. Trial, 38 Cyc. p. 1958 n. 37, 38.

means of undue influence and should for that reason be set aside. On motion of the defendants a new trial was granted, but only upon the issue of the validity of the deeds to the sons. On the second trial evidence was introduced on both sides concerning the father's capacity, a number of witnesses saying they thought him of unsound mind, but a question which was submitted to the jury on that subject was allowed to remain unanswered, and the findings made by the judge were silent on the subject, save for a recital that he was "in a very weakened and feeble condition, in fact on the verge of death" when he executed the deeds to his sons. The judgment, however, included an adjudication of capacity. The allegations of want of capacity must therefore be regarded as disproved, and the evidence on the subject is important only as it may affect the question of undue influence.

1. The principal contention of the defendants is that there was no evidence whatever to support the finding of undue influence. The findings of the court recited in considerable detail the facts on which that finding was based. The vital question may therefore be determined from a consideration of these detailed findings, subject to a further claim that some of them are wholly without support in the evidence. The following are the findings of the court in full, with such comment on each as is made necessary by the defendants' contention that it is not supported by any evidence:

"1. Ernest M. Hodges was a man of about eighty-four years of age and the plaintiffs, four daughters, and the defendants, three sons, were all his children.

"2. That Ernest M. Hodges was a widower and lived alone, and as years came upon him he at times was not well, and it was customary for him to go to his daughter, Ethel Dalton, when so incapacitated.

"3. That at about the first of November, 1924, the said Ernest M. Hodges became ill, and as was his custom went to his daughter, Ethel Dalton, in St. George, Kansas. That on Thanksgiving day that month he became seriously ill, from which sickness he never recovered, but died on March 6, 1925.

"4. That while the said Ernest M. Hodges was at the home of his daughter, Ethel Dalton, he had every convenience and comfort and a trained nurse to wait upon him, but that upon the 23d day of January, 1925, the said Ernest M. Hodges was taken from his said home, against the advice of his physician by the said sons, or defendants, and taken to the home of the defendant, Elmer Hodges, about four miles in the country, where he was kept without modern conveniences and without a nurse until his death; that shortly prior to such removal the defendant, Elmer Hodges, was whispering to his said father, and after the departure of the said son, the said elder Hodges was more nervous and dissatisfied; that prior to the removal of the said Ernest M. Hodges, the defendants called in a strange physician and prepared for the

Post v. Hodges.

removal of their said father, without consulting with or notifying the plaintiff, Ethel Dalton, other than that some one of the defendants suggested upon one occasion that he thought their father would be better off in a hospital, to which the said Ethel Dalton assented; that a short time prior to such removal the said Ernest M. Hodges stated that he desired to go to his son Elmer's house to make division of his property."

The defendants challenge these findings: That Ernest M. Hodges had a trained nurse; that he was moved to Elmer's house against the advice of his physician; that a strange physician was called in; and that shortly prior to the removal he said he desired to go to Elmer's house to divide his property. The sick man's attendant was rather a "practical" than a "trained" nurse as these words are commonly used, but the departure from usage in the description adopted is not very important. The physician originally in charge said he thought the patient should be kept quiet—if there was a chance he could have it that way. "If there was a chance that was the only chance I knew he had." The finding that the doctor advised against removal was doubtless based on this testimony, although he said he told them he didn't know whether it would harm him or be beneficial, and (on cross-examination) gave an affirmative answer to the question, "You told them he might be taken out without doing him any particular harm, but that he should be kept quiet." The sons employed another physician, who was new and strange in the sense that a change was made. The defendants say he was well known. The only basis we discover for the finding that the father said he desired to go to Elmer's house to divide his property is testimony that five or six times he had a whispered conversation with Elmer and "he would be excited and nervous  .  .  . and was always talking about dividing his property," and that his daughter Ethel said to Lem (Lemburn) and his wife, "Every time you boys are down here he is dividing the property."

"5. That just prior to the removal of the said Ernest M. Hodges he stated that the boys, meaning the defendants, wanted him to divide his property and give the girls $1,500, as their share; that the property of the said Ernest M. Hodges was of about the aggregate value of $20,000."

The part of this finding preceding the semicolon is vigorously attacked as without support in the evidence. It is clearly based on the testimony of M. M. Dodson, an old friend of Ernest M. Hodges, who was acting as his nurse. But the abstracts differ in stating his testimony in this respect. The plaintiffs give this renditon of it:

[The father] "said he thought he would give girls $1,500 apiece and divide land between boys; Dodson asked him if he thought that would be a fair settlement and he said he didn't know whether it was or not; Ernest M. Hodges said to him they are trying to get me to give the girls $1,500 apiece and he did not know whether it would be fair or not."

### The defendants print it this way:

"Said he thought he should give the girls $1,500 apiece and divide the land with the boys. I asked him if he called that a fair settlement. He studied a little and said, he did not know whether it was or not. He said they were trying to get him to give the girls $1,500 apiece and he did not know whether it would be fair or not.

"Q. Did he say they were trying to get him to give the girls $1,500 apiece and he did not know whether that was fair or not? A. No."

### The full transcript as to the episode reads:

"Said he thought he should give the girls $1,500 apiece and divide the land with the boys. I asked him if he called that a fair settlement. He studied and little and said he did not know whether it was or not. He said they were . trying to get him to give the girls $1,500 apiece and he did not know whether it would be fair or not.

"Q. Did he say they were trying to get him to give the girls $1,500 apiece and he did not know whether that was fair or not? A. No. He could not remember what he had for breakfast, and could not remember the day of the week. If some acquaintance came in he would brighten up for a few minutes but would soon get dozy."

It seems probable that something is omitted that might explain the seeming irrelevance of the last two sentences, but assuming, as we must, that the transcript is literally accurate, and that the witness contradicted himself, it was for the trial court to determine which version was to be accepted. (*Acker v. Norman,* 72 Kan. 586, 84 Pac. 531.) It is doubtless not a matter to be considered here, but a transcript of the evidence at the first trial, which is among the papers, shows testimony of the witness in accordance with his first statement as above quoted. It will be observed that the court finds it was the sons who wanted the father to give the girls $1,500 as their share, while the testimony of the witness was that the father said "they" were trying to get him to make such a division. We think, however, it is fairly to be inferred that if he used the language attributed to him he was referring to his sons.

"6. That the defendant, Norman Hodges, resides at Palco, Kansas; that on the 20th day of January, 1925, three days before Ernest M. Hodges was moved, Elmer Hodges telephoned the defendant, Norman Hodges, to come, and that

from the 23d day of January, 1925, the three defendants were constantly with the said Ernest M. Hodges until his death."

The defendants criticize this finding as "a little strong, as Lemburn Hodges was not there only a part of the time."

"7. That on the 22d day of January, 1925, the defendant, Norman Hodges, went to the St. George Bank, secured a statement in writing from said bank showing what money and bonds his father had in the bank; that said account was changed to a checking account and removed from said St. George bank by one of the defendants and the money taken to another bank; that Norman W. Hodges receipted the St. George Bank for the liberty bonds and took the bonds with him from the bank; these bonds were assigned to Elmer Hodges the next day, to wit: February 19, 1925.

"That on the 19th day of February, 1925, an attorney was called in and certain deeds were made to the girls to real estate ranging in value from $1,-200 to $1,500 to tracts so deeded and checks were made to each of the defendants for the sum of $3,000; that upon a prior hearing of this case the court sustained the deeds and checks so made and the said Ernest M. Hodges declared at that time that he was going to retain the rest of his property."

This finding is said by the defendants to be immaterial. They say also: "The boys did not take a dollar out of the bank which was not given to them by their father prior to the time the money was removed."

There appears to be no finding number 8.

"9. That on the 26th day of February, 1925, the defendants procured the same attorney to come to the home of Elmer Hodges, brought the notary public and made provisions for witnesses, when the deeds in question were made, the said Ernest M. Hodges at the time being in a very weakened and feeble condition, in fact on the verge of death, as he never rallied and died the evening of March 6, 1925; that at the time of the making of the deeds in question the plaintiffs were not notified and knew nothing of the transaction, though with one exception, living within a few miles of the Elmer Hodges home, except upon one occasion the defendant, Lemburn Hodges, stated to Percy Post that Ernest M. Hodges was going to make deeds and they could not be broken, and for the girls to just start something."

The defendants say "finding No. 9 is a little strong, too." They deny the evidence showed either that on February 26, 1925, their father was on the verge of death and never rallied, or that Lemburn said to Percy Post he was going to make deeds that could not be broken, and for the girls to start something. The accuracy of the statement concerning the sick man's condition is perhaps a matter of opinion. Percy Post's testimony was: "Lem said, Dad is not going to make a will. I said, Why? He said a will can be broken.

He said, Do you know he can deed to whoever he wants to? I
said I guess he can, it is his. I said, If a will won't stand, will a
deed? and he gave no answer." His wife testified: "He [Lem]
said let them start something if they want to, and the other brother
said, yes, let them start something."

"10. That the deeds in question were all recorded the next day at one and
the same time, and the recording fee therefor paid by the defendant, Elmer
Hodges; that there was no consideration for said deeds.

"11. That the deeds in question were drawn by an attorney from Man-
hattan, acknowledged by a notary public from Wamego, and witnessed by a
man from St. George and the nearest neighbor of the defendant, Elmer
Hodges.

"12. That the defendants were arranging for their father's funeral before
he was taken from the Dalton home and moved to the Elmer Hodges home;
that on February 12 the defendants had J. M. Best of Manhattan come to
the Elmer Hodges home, where Ernest M. Hodges was sick and make arrange-
ments for Ernest M. Hodges' funeral; that these arrangements made with
J. M. Best were made without consulting any of the plaintiffs, and made two
weeks before the deeds in question were executed."

The defendants say this finding is on matters not involved in
this litigation, adding: "The defendants made no arrangements
whatever with reference to their father's funeral until after he was
dead, other than to find out, at the request of their father, whether
a Klan funeral could be had at the home of Ethel Dalton." A wit-
ness for the defendants testified that the defendants came to him
at Manhattan in January and told him their father desired a Klan
funeral—that he was a very sick man and could not live a great
while.

"13. That the testimony of the defendants that they knew nothing of the
deeds in question until delivered to them is not true, every circumstance in
the case pointing to the contrary, and the court so finds."

The defendants say: "No one testified that the boys ever talked
to their father with reference to the deeds. They swore positively
that they did not know to whom and how the deeds were to be
made."

Norman testified: "I did not know my father was going to make
the deeds as he did on February 26, 1925." Lem testified: "I did
not know the deeds were going to be executed until they were
signed." Elmer testified: "I did not know prior to February 26,
1925, that my father was going to make a deed to me." Mrs. Post
testified that two weeks or two and a half weeks before their

father's death Lem told her papers were going to be made out. To the question in cross-examination: "Do you know when it was they told you papers were going to be made out?" she answered, "I don't know the exact date." Testimony has already been quoted in which an intention was indicated of having deeds made instead of a will.

"14. That the deeds in question were procured by defendants by undue influence."

This of course involves the general question whether there was evidence sufficient to support the judgment.

Proof of just what was said by the sons to the father is lacking. We think, however, the findings made by the court, after disregarding any parts that may not be sustained by the evidence, fairly tend to show that the sons advised their father to limit the share of the property given the girls to $1,500, and also that the division made was influenced by that advice. If these facts are established we think an inference that the influence so exerted was "undue" may reasonably be drawn from the attendant circumstances—the arrangements made by the brothers which resulted in giving them convenient access to their father in the absence of their sisters; their covert talk with him; their apparent coöperation with each other in the matter; their father's enfeebled condition, and their arrangements in advance for his funeral; their omission to let the sisters know what was going on; and their false statements that they did not know in advance that the deeds were going to be made.

2. The defendants also complain of the refusal of the court to make additional findings setting out the character of the acts by which the several defendants induced the execution of the deeds. From what has already been said it is manifest this could not be done.

"In the nature of things it would be a rare case where the details of conversation or conduct could be shown indicating undue persuasion and influence. Such arts would be exercised only in the absence of witnesses, or, at most, in the presence of those whose interest and inclination would impel to their denial." (*Howard v. Carter,* 71 Kan. 85, 92, 80 Pac. 61.)

The court was asked to make two additional findings—not to find either one way or the other upon a suggested question, as the court should determine, but to find in favor of the defendant's contention. The refusal to do this is not available as error on review. If the evidence left the matter in doubt it was for the court to decide

upon the proper finding. If as a matter of law only one conclusion was possible to be drawn there was no occasion for a finding. (*Johnson v. Schrader*, 114 Kan. 341, 219 Pac. 269.)

"To be of any avail, a request for a finding must be made by one of the parties, and should not be in the form of a finding, but should point the propositions on which a finding is desired." (38 Cyc. 1957.)

3. Complaint is made of the refusal to admit in evidence the entry upon the journal concerning the proceedings relating to the first trial. There could be no occasion for the introduction of the record in evidence, for the court would take judicial notice of it. The jury of course served in a purely advisory capacity.

The judgment is affirmed.

BURCH, J., dissenting.